The next argument is in Appeal No. 05-5181, Kimco Realty Corp v. United States. Good morning. Welcome. Please proceed. Good morning, Your Honors. My name is Robert Kellock. I represent Kimco, which is a National Shopping Center owner. It is the owner of the Center Reach Mall, a regional shopping center with an enclosed mall, some freestanding stores. We know the facts. We've read the briefs. We know the facts. There's one fact I don't know, and perhaps you would clarify it for me. Who's been paying the general maintenance costs of maintaining the post office building? Post office. Painting and... Post office. Post office has been paying them. That has not been part of the shopping center's coverage at all. The post office building is approximately 9,800 square feet. Postal service is responsible under the lease, and the postal service is exclusively responsible for the maintenance of the enclosed 38,000-foot demised premises, which is the area that is exclusively dedicated to postal service trucks and not for general shopping centers. And the post office pays all of that? Correct. And that is its sole responsibility, both under the lease and the right of the lease. And that's true of the indoor part as well as the outdoor part? Yes, Your Honor. It's true of the inside of the building as well as the small parking lot right by the post office building? Yes, it is, Your Honor. But that is no different than, say, a freestanding McDonald's, where the tenant would be responsible for the building, the demised premises, and for plowing its own drive-thru, even though the common areas that are used by the McDonald's patrons and the Walmart patrons would park in one or another area and go freely. You know, the case law is unremarkable, and it basically puts us back into a commercial reasonableness standard. Common area maintenance is neither a profit center nor a loss for a landlord. The whole idea is that 100 percent of the common area maintenance of a shopping center will be borne pro rata by the tenants. The landlord won't make money, and the landlord won't lose money. Now, if that's the case, the way to assure that everybody understands those ground rules would be for the lease or the associated rider to define common areas. Is there such a definition anywhere in the documents here? None that I'm aware of, and certainly none that the parties have cited to. But you certainly have the declarations indicate that the common understanding in the shopping center industry is that the result here is we have 97 percent of the tenants paying for the common parking lots, the mall areas, the lighting, the insurance, the sewer expense. And we have the post office, which occupies proportionally 3 percent of the total shopping center, which is not because of the way the— Well, how do we know, for example, that Walmart is paying its 3 percent or 4 percent or whatever the exact percentage would be of the total maintenance and repair costs of the entire mall, entire shopping center? You wouldn't know within the four corners of the lease or the briefs or the appendix. You would know because in common practice there are CAM audits. There are large tenants, and every tenant has that right. The Postal Service could exercise it to do an audit. It comes about commonly, but it's not a matter— But that would be if somebody was disputing the percentage or— What happens is every tenant has a right to an accounting, both on the contract principles— I wasn't asking that. I was asking whether the obligations of Walmart are the same as you're saying the obligations of the Postal Service are, namely, a proportionate share of the total maintenance costs of the entire shopping center. I'm saying in the scheme of shopping centers and every one I've seen, it is. I don't know what the Walmart lease is because it's not part of this record, and it was not considered in connection with this case. Now, when you refer to declarations about the common understanding and this trade of the term common area, can you be more specific what part of what declaration you're referring to? The Milberg Affirmation Declaration just simply says that the common understanding speaks about the common— Page. Your Honor, I'll have to find it. I cited to it in the brief, and at the moment, Milberg Declaration is at Appendix 52. Let me just try to find the statement because I observed it in the brief last evening. I'm defining a good part of my argument to reading a declaration that was written five years ago, Your Honor, and I just cannot locate it. Perhaps you can give me the site on rebuttal and save the time. Okay. In any event, Your Honor, we don't, you know, the Postal Service Council and I do not quarrel with the applicable principles. They're well settled in this court and in state courts and federal courts of general jurisdiction. The question really is what is meant by the language of all applicable common area maintenance costs. We say that the circuit, the United States Court of Appeals for the Federal Circuit basically moved the modifier all in the wrong place. You mean the Court of Federal Claims? Yeah, and produced a strained and unreasonable interpretation that basically has the Postal Service alone among the shopping center's tenants only paying for common costs that are deemed to be beneficial for the Postal Service. Let me ask you this question going to the procedural posture of this case. Now, each of you filed cross motions for summary judgment and at the same time, as I understand it, waived the opportunity for an evidentiary hearing. Suppose that we should agree with you that it was inappropriate for the trial court to grant summary judgment to the government based on our conclusion, if we should reach that conclusion, that this language is just not clear cut enough to justify judgment for the government. But we also conclude that it isn't clear cut enough to justify summary judgment for you and that is there any parole evidence available? Is there anything that anybody would like to offer? I would not invite the court to invite a swearing contract test in the trial court among the drafters of this imprecise instrument in 1984. The shopping center owner went into bankruptcy. There was a foreclosure. Kimco acquired it 10 years ago. No one knows whether the draftsman or the Postal Service representative could be located. But beyond that, the case law would not encourage that result. As imprecise as the language is, I think the proper legal outcome is to construe the instrument within its four corners, giving fair meaning to all the language used and viewing the commercial setting of the parties. And what do we do if we conclude that it's just profoundly and insolubly ambiguous? I don't think and I don't want to— I'll be presumptuous, Your Honor. Since parole evidence is almost never called for dealing with a commercial instrument, unless there's going to be some dispositive interpretive issue that could be illuminated by testimony, a court's role is to look at the entirety of the lease and decide what is the better and more sensible interpretation. In that context, and you've invited us to look at the behavior of the real estate community or the common way of reading all of this, let me be sure I understand something going on here. Using the Chief Judge's hypothetical about Walmart, let's assume Walmart had a piece of this shopping center in the post office we know about. Would Walmart be paying for its own painting or would that be part of the common area? It is paying for the painting in its building. But I can give an illustration, Your Honor, because it actually arose in another case. We had a case with an enclosed mall and out parcel stores such as a Toys R Us and a McDonald's. And there was a mall center. There was a shopping center in Staten Island. And on a CAM audit, the Toys R Us representative said that Toys R Us should not pay for the mall center as a common area expense because the Toys R Us store was a freestanding building that did not benefit from the Santa Claus in the mall. It was a position that was not sustained because a shopping center is a species of cooperative. And the reason there are so many postal service properties located in the shopping center is to be accessible to the community. The postal service is a service agency. It's supposed to be acceptable. People should be able to shop in Walmart and do their mailings. I understand all that, but here's what I'm trying to get a handle on. When you talk about common area expenses, and we opened the discussion with your explaining to us that the post office actually pays all of its own interior and exterior expenses within its own little, what do you call it, freestanding or you have a name for it? 9,800 square foot. Yeah, but you had a name for those kind of outliers. Oh, no. The demise premises was the actual 38,000 square foot postal that's fenced and is devoted exclusively to postal service trucks plus their buildings. And you have a name for that kind of thing? I thought you used a label for it. It doesn't matter. Whatever it is. We'll call it a separate building, whatever. Freestanding. Freestanding. Thank you. You said that was freestanding. What I'm trying to figure out is whether the non-freestanding businesses in the mall pay the same kind of expenses for their non-freestanding facilities. Certainly, Your Honor. The shoe store has got to replace the light bulbs. It's got to replace the hung ceiling. It's got to repaint the shelves. It's got to paint its own walls. Everybody. So what is the common area that we're all dealing with? It's actually mopping the mall. It's heating the mall. It's plowing the parking lot. It's lighting. It's providing security. But for the freestanding buildings, they don't benefit from mopping of the mall, do they? They do because they're customers. Because of the cooperative nature of the shopping center, and that's why it's common area maintenance, their patrons will patronize both the enclosed mall areas and the outside mall areas. This is the Santa problem. Walmart wants to be where the post office customers are, and the post office wants to be where the Walmart customers are, and the pizzeria customers are in the enclosed mall, Your Honor. And the answer is you can't have a balkanized shopping center with the tenants having the language they're going to pay all applicable common area costs that the pizzeria is going to say, you know something, if you plow by the postal service, it doesn't benefit me because maybe my pizza customer is not buying stamps. And for Walmart to take a view that they don't want, they're going to assume that their customers use the internet and don't use the U.S. mails. It's just not a commercially reasonable construction. But that's not what they're arguing here. They're agreeing they should have to pay for the general parking lot as well as the 36,000 foot demised premises. They're only saying they shouldn't have to pay for the expenses on the interior of the mall. And that's inconsistent with the lease. How is it inconsistent with the lease? What aspect of the lease? Because the only modifier is all applicable common area costs. But this all depends on the construction of the term common area, which isn't defined. It's not defined other than all. All common area just means whatever common area is. How about the rider? I'm aware, Your Honor, that it does. What do you want to make of rider 43, which talks about tenant will be responsible for any and all general maintenance for the common area maintenance for his 38,618, which I assume that's Your Honor, that's referring to something else. That's the demised area for which the Postal Service is separately responsible. Our reply brief focuses on the fact that the rider doesn't really illuminate 33 of the lease itself. That section says the Postal Service has to do its own plowing in the area exclusively, the fenced area exclusively devoted to its own trucks. So there, in that area, the tenant is responsible for all of its cleaning, maintenance, sew removal, lighting, and electricity. In other words, that doesn't inform what paragraph 33 of the lease means. Again, Your Honor, I think I'll reserve some rebuttal time because I want to find the language. But essentially, it's inconsistent with a wealth of case law. We look to some New York cases because it does illustrate the irony. Well, what about applicable? Applicable means applicable to common area maintenance. It doesn't mean applicable to the Postal Service. We just think that the applicable means Well, what's the difference if you include applicable or you take it out? Well, I suppose because then if you had a capital repair to the shopping center, it wouldn't be a common area maintenance expense. If you changed, if you had to, you know, Well, it wouldn't be because it wouldn't be maintenance. It would be capital, which is different from maintenance. So that doesn't help me understand what subset of common areas are identified by the phrase applicable common areas. Your Honor, we submit it's applicable to common area maintenance, not applicable to the Postal Service under this lease. And again, otherwise, as I said, in a New York appellate court, because this issue is dispositively decided by the bad case, it means that 97% of the tenants having the same lease would have to pay all shopping center costs, and the Postal Service wouldn't because fortuitously this case was decided by a judge sitting in the United States Court of Appeals for the Federal Circuit who read all in the wrong place. Court of Federal Claims. I think the language you're looking for may be at A59, note one. I think that's the one. I won't have to use the rebuttal clause. If you have something else in mind, it may be somewhere else, but that might be a place to start. I know I excited to in the brief, so I'm convinced Your Honor is right. Thank you very much. Mr. Keeley. I have a preliminary question for you. Was this case discussed between the parties for the purposes of possible compromise or settlement or mediation or any sensible resolution of the dispute here? In order to obviate the proceedings today, no, no, it was not. Why not? We had a stipulation that would— We're talking about costs that go back a whole decade, and we've been litigating since 1998 in the Court of Federal Claims. It's now 2006, and we still haven't resolved this fairly simple dispute that has hundreds of analogs all over the country. It shouldn't be that hard for two good lawyers to work this out. Well, Your Honor, one of the problems is it's not just a retrospective case. It's also a prospective case. The lease will be in place for another 10 or 15 years, I believe. So this will have—the decision of the court will have a prospective effect upon the financial obligations of the Postal Service as well as a retrospective effect. So we're not really dealing with just the dollars that are in controversy here. And also we would also be dealing with the CAM charges that have not yet been assessed by the appellants against the Postal Service for the period of 1998 through to date. So the portion of the dispute that's before the court— It sounds like what you're saying is if the amount of money is significant, that automatically means compromise or settlement or mediation is out of the question. That hardly seems like a good response. No, Your Honor, I would not rule compromise out of the question. We did not appeal the case. We prevailed below. So we even—as a stipulation on damages that we submitted after Judge Margolis' decision, I believe that the Postal Service did, in fact, in good faith, try to broaden the categories of CAM charges that might be included. So we would not be as stuck in cement, I think, as might appear to the court at first blush. Well, don't spend any more of your time on it. I just thought it was odd to have this case dragging on for a decade and having to be resolved here. But that's— Let me ask a question that goes to the heart of what's troubling me about your position in this case, as I understand it. There are three, perhaps, different ways of looking at the scope of the maintenance obligation. One is to say it's limited to the 38,000 square feet, and nobody makes that argument. You don't, and they obviously don't. Another is to say, well, it applies to the entire shopping center, and that's their argument. That's what the CAM is, is the entire shopping center. You make a third argument, which is that it doesn't apply to the entire shopping center, but it is more expansive than the 38,000. And you say, well, it applies to the parking lot. Now, the problem I have is that there's nothing in the lease that identifies that third area, the parking lot, but not the rest of them all. I mean, if we take the plaintiff's suggestion, which seems to be consistent with at least some of the evidence that was presented, that common area maintenance is normally understood to be the entire premises, the entire mall, where do you get the notion that the parking lot is a legitimate subset on which to predicate your responsibilities? Your Honor, we would get that from the enumeration of the CAM charges in paragraphs 32. So it's the adjustum generis argument is really what it is, right? Right. That would be it. But how can that hold up when the expenses the Postal Service must cover 100% has the exact same verbiage, but we all know that it applies indoors and outdoors, and it applies to every kind of maintenance? I don't think that's exactly correct, Your Honor. The primary provision that governs the Postal Service's maintenance for its own patch of land is paragraph 28 of the lease. I believe it's on page 68 of the joint appendix. All right. So there's a separate provision regarding specific maintenance for the Postal Service's own land. Now, the provision in paragraph 43, which I think Chief Judge Michel, you're referring to, we read that as a provision that applies strictly to common area maintenance. The first part of that paragraph lists – sets forth a methodology for computing the common area maintenance that's applicable to the Postal Service. And the second sentence then, in essence, reiterates the provisions of paragraph 33, which limits the camp charges that can be opposed against the Postal Service to essentially those that refer to outdoor maintenance. Why do you say that? What's wrong with that? That's not true. I think we have the same question. Go ahead. Let's look at the justum generis interpretation of paragraph 33. Isn't that what you want? Yes, Your Honor. All right. Let's read it in reverse, that is, from the bottom up. Repair of curving. That's clearly a parking lot problem, right? I would say so. Landscaping and maintenance thereof is not necessarily a parking lot problem. You have landscaping independent of parking lots, that is, across the front of the building and around the side. And, you know, it depends on the particular layout, doesn't it? Right. I think that would be a fact-specific issue for this particular mall. I'm willing to concede for this particular mall that it's probably heavily related to the parking lot. Let's go on. Maintenance of signs. Well, yes, there are going to be signs as to where to park, but there are going to be a lot of other signs throughout the mall. So that's clearly not limited to parking lots. Parking lot maintenance and striping. Ah, we finally find one that really is directly parking lot. Then we have snow removal, maintenance of lighting, and cost of electricity. That's a peculiar one because snow removal certainly presumably is the parking lot, although it could also be sidewalks and things. Maintenance of lighting and cost of electricity, which is why I asked the question whether they had to pay their own electric bill, and apparently they do, so I'm willing to give you that as a parking lot issue. But look at the very first one. General cleaning, including maintenance personnel. Well, if that doesn't include the whole mall, I don't know what does. We view that as meaning the cleaning of the outdoor area. Well, I know that's what you view it, but there's nothing in it that says that. And indeed, the preceding clause is such costs shall include, but not limited to, the following. It's syntactically not very nice, but I think what it means is such costs shall include, but not be limited to, the following. General cleaning, including maintenance personnel. Well, if I had something like that and I were the shopping center owner, I'd say, well, good. We're going to do general cleaning and maintenance personnel. Your Honor, I don't think you could say that that would apply to painting and plumbing, sprinkler and fire protection, heating, ventilation, air conditioning, mall lights, electric house meters, electric interior mall lights. Why wouldn't it apply? These are amendments of lighting. Why isn't lighting pretty clear? We interpret the lighting to refer to the outdoor lighting in apartments. Yeah, but you can't just say you interpret it because you choose to interpret it. You have to have a basis, and it has to be a reasonable basis. Where is your basis for having that interpretation? Well, Your Honor, I would direct your attention to page 20 of our brief, which cites to the CAM charges that the appellants seek to impose upon the postal service, and that had a specific entry for interior mall lights. Of course, but so what? There's no indication anywhere I can find in the language of the rider or the lease that restricts postal obligations to outdoor areas. If this language had said maintenance of exterior or outdoor lighting, then at least with respect to that clause, you'd have something to say. But it seems to me when it says maintenance of lighting, to my mind, this really undermines the adjustum generis argument that is, as far as I can see, really about the only thing that tells me that maybe there's a reason to read this CAM as being less than the entire mall. Because, again, to get back to my initial problem, I don't see anything, any support for your original hypothesis, which is that the CAM is this area of the parking lot but not the whole mall. I continue to have trouble with that. I would suggest that our interpretation of this, which restricts the understanding of it to the exterior of the mall, is a more reasonable interpretation than appellants' interpretation, which includes everything. I think if the court below chose between those interpretations, I believe it made the reasonable selection because our interpretation tries to give understanding and reason to all the portions of the lease, whereas the appellant is just seeking everything. That's a nice point, counsel, and I like that point. Let's assume for the moment that we don't read this clause as being limited to the parking lot. That then opens it up to electricity, general cleaning, maintenance of lighting, cost of electricity. Are there any limits? Where would we then find limits on what can be thrown into the CAM accounting? Is there any place other than just stopping at the parking lot? I think that would be a difficult task for this court based upon what you have in mind. Well, we're not going to do it, obviously, but wouldn't the trial court apply a rule of reason to whatever it is they're claiming? Would custom in the community then, in the real estate community, become relevant to that decision? Not immediately relevant. I think what would be most relevant would be the original intent of the parties. And with that in mind, it's important to recall that the appellant in this case was not an original party to this lease. It came on board nine years after the lease had been signed. So what? He's the successor in interest. Okay, but if there is a course of dealing between the parties prior to the successor in interest obtaining the lease, then I think that would be determinative of the meaning of this paragraph more than the meaning that the successor in interest imported into the case almost a decade after the lease was signed. And what is the evidence of the course of dealing? Well, the evidence of that is a little scant, Your Honor. Yeah, I'd say. I looked real hard for it, and I didn't see much. There is a reference in page 6, footnote 1 of page 6 of our principal brief. Yeah, where does that come from? That was a bill that came from a bill of the predecessor. Yeah, but the rest of your footnote seems to assume facts that you don't have any proof of. Such as what, Your Honor? What that refers to. The footnote refers to a CAM charge bill that the Postal Service received by the predecessor to the appellant. And we compared the amount of that to the amount of the bills that the appellant submitted. Yeah, but you're assuming that the charges would remain constant over the entire lifetime of the shopping center. It seems to me the obvious assumption is quite the contrary. If something gets older, it needs a lot more repair than when it's brand new. But these are maintenance charges. But, Your Honor, same thing. They shouldn't quadruple the next year. This, in essence, would be our position with regard to that specific fact. Well, suppose they decided that they needed a security service. I mean, you're not suggesting that. I mean, security service would be, you'd be partially liable under your theory, I take it. Absolutely, and we're paying for security service. But only to the extent that the security officers are patrolling the parking lot, right? That is correct. But not to the extent that they spend time inside the mall. I'm not sure that in the charges that we have received that they have broken it out in those ways. I've reviewed the bills, but we have paid or agreed to pay for outdoor security services. They have a vehicle patrolling the premises, and that is not a cost that's listed. It's enumerated in the lease, and we've agreed to pay that. Counsel, can you cite any other tenant at this shopping center that isn't paying on the basis of the entire shopping center, a percentage on the entire shopping center? Your Honor, I haven't reviewed the lease. Well, then how can you talk to us about the intent of the parties or prior practice when you're turning a blind eye to every other tenant except yourself at that shopping center? That seems just totally unreasonable to me. If you are all paying only for outdoor cam costs, that would be a point in your favor. But if everybody except you is paying indoor and outdoor costs, that's very much against you. And for you to not bother to check what all the fellow tenants are paying seems to me to be very remiss. Your Honor, I would say that the parties have a right to bargain for what they want to pay for. What the other people want to pay for really is their business. The Postal Service in this case sought to bargain for a reduced amount of cam charges and believes it did so. And then nine years later, a new landlord says, no, no, we think we know better than you do. What is the evidence that they bargained for a reduced amount of services? I would say the terms of the lease. Okay. We come back to the terms of the lease. Who wrote the lease? There is no other evidence in that regard. Not in the four corners of the lease. Who wrote the lease? The Postal Service wrote it. Who wrote the right? I believe the Postal Service wrote it. Entirely. I wouldn't vouch for that, but my experience is that they probably submitted it to the lessor, and the lessor may have made minor changes. But the bulk of the authorship— So the Postal Service was in the perfect position to limit their liability by specifying that the common area charges were limited to the main parking lot and nothing more, period. And they didn't do it. And now they're trying to say, well, read the lease as if we had put that in there, because that's kind of what we'd prefer. Well, we didn't do those exact words, Your Honor, but I think the interpretation of the contract that gives reason to everything would lead us to that conclusion. And if there are no further questions, Your Honor— I just hope you're not paying for security services that go beyond the parking lot because you're wasting government money under your theory. We'll look into that, Your Honor. I hope you will. Thank you. If I may just—excuse me, very briefly. You're correct, Judge Bison. The material I referred to in the Milbert declaration is the footnote at Appendix 59 that indicates it's the only evidence in the summary judgment record regarding the commercial understanding in the shopping center industry, and it does come from an appropriately qualified expert. I also referred to the argument in the briefs on the tax argument as a settled matter of New York statutory and decisional law. It is just not exempt property. It's a single tax law, unallocated, and the lay opinion of a tax successor is not a basis to disturb New York statutory law. We rightly gave government counsel a bit of a hard time—it was in good spirit, though—about settling this case. Now, what about your side on the settlement issue? Your Honor, it took three years just to settle the damages with them when they won. They took such a restrictive position under Judge Margolis' decision as to what was compensable that we went through two audits, days of reviews, and finally, in frustration, just agreed to their number in order to render it final or, if it's affirmed, to go forward. We've just not been able to get them to budge. They took a very restrictive position, even under the victory they had before Judge Margolis, in determining what was the proper scope of reimbursable expenses. They're paying, I think, 20 percent of what it should be, and we just cannot arrive at a number. And it does implicate, over the life of the lease, close to a million dollars, potentially, with 15 years to go. Thank you very much. All right. We thank both counsel. We'll take Kim. Thank you.